BROWN, Circuit Judge,
concurring in part and dissenting in part:
I join today’s opinion on all issues save the Court’s decision to vacate and remand the pipeline certificates on the issue of downstream greenhouse emissions. Case law is clear:, When an agency “‘has no *1380 ability to prevent a certain effect due to’ [its] ‘limited statutory authority over the relevant action[ ],’ then that action ‘cannot be considered a legally relevant cause’ ” of an indirect environmental effect under the National Environmental Policy Act (“NEPA”). Sierra Club (Freeport) v. FERC, 827 F.3d 36, 47 (D.C. Cir. 2016) (quoting Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 770, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004)). Thus, when the occurrence of an indirect environmental effect is contingent upon the issuance of a license from a separate agency, the agency under review is not required to address those indirect effects in its NEPA analysis. Although this case seems indistinguishable from earlier precedent, the Court now insists the action taken by the Federal Energy Regulatory Commission (“FERC” or “the Commission”) is the cause of an environmental effect, even though the agency has no authority to prevent the effect. But see Pub. Citizen, 541 U.S. at 767,124 S.Ct. 2204 (holding “but for” causation is insufficient to make an agency responsible for a particular effect under NEPA). More significantly, today’s opinion completely omits any discussion of the role Florida’s state agencies play in the construction and expansion of power plants within the state— a question that should be dispositive. Because the Court’s holding is legally incorrect and contravenes our duty to examine all arguments presented, I respectfully dissent.
When examining a NEPA claim, our role is limited to ensuring the relevant agency took a “hard look at the environmental consequences” of its decisions and “adequately considered and disclosed the environmental impact of its actions.” Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, 462 U.S. 87, 97-98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). We examine the agency’s determinations under the “deferential rule of reason,” which governs which environmental impacts the agency must discuss and the “extent to which it must discuss them.” WildEarth Guardians v. Jewell, 738 F.3d 298, 310 (D.C. Cir. 2013). FERC thus has broad discretion to determine “whether and to what extent to [discuss environmental impacts] based on the usefulness of any new potential informa-' tion to [its] decisionmaking process.” Pub. Citizen, 541 U.S. at 767, 124 S.Ct. 2204. Here, FERC declined to engage in an in-depth examination of downstream greenhouse gas emissions because there is no causal relationship between approval of the proposed pipelines and the downstream greenhouse emissions; and, even if a causal relationship exists, any additional analysis would not meaningfully contribute to its decisionmaking. Both determinations were reasonable and entitled to deference.
Regarding causation, the Court is correct that NEPA requires an environmental analysis to include indirect effects that are “reasonably foreseeable,” Freeport, 827 F.3d at 46, but it misunderstands what qualifies as reasonably foreseeable. The Court blithely asserts it is “not just the journey,” it is “also the destination.” Maj. Op. at 1371. In fact, NEPA is a procedural statute that is all about the journey. It compels agencies to consider all environmental effects likely to result from the project under review, but it “does not dictate particular decisional outcomes.” Sierra Club v. U.S. Army Corps of Engineers, 803 F.3d 31, 37 (D.C. Cir. 2015) (emphasis added). The statute therefore “requires a reasonably close causal relationship between the environmental effect and the alleged cause” that is “akin to proximate cause in tort law.” Pub. Citizen, 541 U.S. at 754, 767, 124 S.Ct. 2204. Thus, the fact that the Commission’s action is a “but for” cause of an environmental effect is insufficient to make it responsible for a particular environmental effect. Id. Instead, the *1381 effect must be “sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.” Freeport, 827 F.3d at 47. There is a further caveat: An effect the agency is powerless to prevent does not fall within NEPA’s ambit. Here, the Commission explained in its denial of rehearing that any “environmental effects resulting from end use emissions from natural gas consumption are generally neither caused by a proposed pipeline (or other natural gas infrastructure) project nor are they reasonably foreseeable consequences of our approval of an infrastructure project.” JA 1330. FERC’s conclusion is both logical and consistent with this Court’s precedent. While the Court concludes FERC’s approval of the proposed pipelines will be the cause of greenhouse gas emissions because a significant portion of the natural gas transported through the pipeline will be burned at power plants, see Maj. Op. at 1371, the truth is that FERC has no control over whether the power plants that will emit these greenhouse gases will come into existence or remain in operation.
In several recent cases, petitioners sought review of a downstream environmental effect that fell within the oversight of another agency. We held the occurrence of a downstream environmental effect, contingent upon the issuance of a license from another agency with the sole authority to authorize the source of those downstream effects, cannot be attributed to the Commission; its actions “cannot be considered a legally relevant cause of the effect for NEPA purposes.” See Freeport, 827 F.3d at 47; Sierra Club (Sabine Pass) v. FERC, 827 F.3d 59, 68 (D.C. Cir. 2016); EarthReports, Inc. v. FERC, 828 F.3d 949, 952 (D.C. Cir. 2016); see also Sierra Club v. FERC, 672 Fed.Appx. 38, 39 (D.C. Cir. 2016). In Freeport, for example, the petitioners argued the Commission failed to adequately consider the downstream greenhouse gas emissions that would result from increased exports of natural gas because the Commission authorized construction of a natural gas export facility. We said the Commission’s NEPA analysis did not have to address these downstream effects because the Department of Energy (“DOE”) had the “sole authority to license the export of any natural gas going through [the export facility].” See Freeport, 827 F.3d at 47; see also EarthReports, 828 F.3d at 955. Relying on binding precedent from the Supreme Court, we reasoned causation could not exist where an agency “‘has no ability to prevent a certain effect due to’ that agency’s ‘limited statutory authority over the relevant action.’” Freeport, 827 F.3d at 47 (quoting Pub. Citizen, 541 U.S. at 770, 124 S.Ct. 2204) (alteration omitted); see also EarthReports, 828 F.3d at 955.
This case presents virtually identical circumstances. Under the Florida Electrical Power Plant Siting Act, “a power plant cannot be built unless a site certification is obtained” from the Florida Power Plant Siting Board (“the Board”). Ecodyne Cooling Div. of Ecodyne Corp. v. City of Lakeland, 893 F.2d 297, 299 (11th Cir. 1990) (citing Fla. Stat. §§ 403.506, 403.511). “Such certification constitutes the sole license for a power plant’s construction and operation.” Id. (citing Fla. Stat. § 403.511); see also Seminole Tribe of Fla. v. Hendry Cty., 114 So.3d 1073, 1075 (Fla. Dist. Ct. App. 2013) (“It is clear from this statutory language that the [Florida Electrical Power Plant Siting Act] is a centrally coordinated, one-stop licensing process.”). Accordingly, no power plant is built or expanded in the state of Florida— and consequently no greenhouse gases are emitted from Florida power plants—without the Board’s approval. See Fla. Stat. § 403.506(1) (stating no power plant may be constructed or expanded “without first *1382 obtaining certification” from the Board). This breaks the chain of causation. See Pub. Citizen, 541 U.S. at 754, 124 S.Ct. 2204 (analogizing the NEPA causal relationship to “proximate cause in tort law”). NEPA does not require FERC to address indirect environmental effects resulting from the Board’s licensing decision. See Freeport, 827 F.3d at 47-48 (holding the Commission need not address downstream environmental effects if “triggering [the] chain of events” leading to those effects requires the “critical ... intervening action” of another agency).
Despite this clearly-controlling case law and the exclusive authority of the state Board to license the construction and expansion of power plants in Florida, the Court concludes FERC’s approval of .the pipeline is a “legally relevant cause” of the greenhouse gas emissions from the Florida power plants. See Maj. Op. at 1372. But its attempt to explain why NEPA operates more expansively when applied to pipelines compared to export terminals, ás well as its arguments as to why the Florida Board should be treated differently than DOE under NEPA, are both ultimately unpersuasive.. Both projects qualify as “major [fjederal actions significantly affecting .the quality of the human environment,” 42 U.S.C. § 4332(C), so there is no reason why NEPA’s requirement to consider indirect environmental effects would not apply equally to both. Moreover, nothing in the statutory language empowering the Commission to regulate export terminals and pipelines suggests the Commission’s authority is more limited in one circumstance than another. Congress has granted -the Commission “the exclusive authority to,approve or deny an application for the siting, construction, expansion, or operation of an [export] terminal,” 15 U.S.C. § 717b(e)(l), and to impose any conditions on those terminals the Commission finds to be “necessary or appropriate,” id. § 717b(e)(3)(A). Thus, the Commission has the power to approve or deny the construction and operation of export terminals subject to any conditions it wishes to impose. Likewise, Congress requires any applicant seeking to construct or extend natural gas transportation facilities to obtain a “certificate of public convenience and necessity” from the Commission. Id, § 717f(c)(l)(A). The Commission “shall” issue a certificate if “the applicant is able and willing properly to-do the acts and to perform the service proposed” and if the proposed service or construction “is or will- be required by the present or future public convenience and necessity.” Id. § 717f(e); FERC also has the “power to attach to the issuance of the certificate . -., such reasonable terms and conditions as the public convenience and necessity may require.” Id. Accordingly, nothing in the text of either statute empowers the Commission to entirely deny the 'construction of an export terminal or the issuance of a certificate based solely on an adverse indirect environmental effect regulated by another agency. See id, §§ 717b(e), 717f(e).
'The actual distinction between this case and the DOE cases discussed above is doctrinally invisible. We stated in Freeport that “[i]n the specific circumstances where ... an agency has no ability to prevent a certain effect due to that agency’s limited statutory authority over the relevant action, then that action cannot be considered a legally relevant ‘cause’, of the effect for NEPA purposes.” 827 F.3d at 47. Those “specific circumstances” exist here. FERC’s statutory authority is limited by the fact that the Board, not FERC, has the “sole authority” to authorize or prohibit the construction or expansion of power plants in Florida. See id. at 48. If this Court wishes to apply the “touchstone of Public Citizen” that “[a]n agency has no obligation to gather or consider environ *1383 mental information if it has no statutory authority to act on that information,” Maj. Op. at 1372, it must consider not only whether an agency can act, but whether the results of such action would have an effect on the indirect environmental impact.
Even if the Court is correct that the Commission has the power to deny pipeline certificates based on indirect environmental concerns, such a denial represents the limit of the Commission’s statutory power. Nothing would prevent the Florida Board from independently approving the construction or expansion of the power plants at issue. In fact, the record shows the Board has already approved some of these projects prior to the Commission reaching a decision on the proposed pipelines. JA 910-11. Moreover, there is also nothing preventing the Intervenors from pursuing an alternative method of delivery to account for the same amount of natural gas. Practical considerations point in the opposite direction. Both the Board and the Commission have concluded Florida has a need for additional natural gas, and nothing in today’s opinion takes issue with those holdings. Additionally, the Commis-sion has concluded that the failure to take action to address this natural-gas shortage “could result in ... fuel shortages” and “could lead to insufficient energy production to meet expected demands.” JA 920. Given the dire consequences of failing to act, it is inconceivable that the Intervenor utility companies would stand idly by and allow a power crisis to develop. The much more likely result is that they would simply choose another alternative—albeit a much more inconvenient, expensive, and possibly environmentally-harmful alternative—in response to a denial of a certificate by FERC. See Oral Arg. Rec. at 59:45-59:50 (stating the Intervenors are “going to keep the lights on” regardless of whether FERC approves the pipelines).
Thus, just as FERC in the DOE cases and the Federal Motor Carrier Safety Administration in Public Citizen did not have the legal power to prevent certain environmental effects, the Commission here has no authority to prevent the emission of greenhouse gases through newly-constructed or expanded power plants approved by the Board. To be sure, the Commission could make it extremely inconvenient to deliver the same amount of natural gas to the plants, but this is an issue of practicality, which, as conceded by the majority, is irrelevant under NEPA. See Maj. Op. at 1373. Accordingly, the Commission was not obligated under NEPA to discuss downstream greenhouse gas emissions, and I would deny the entire petition for review.